NOT DESIGNATED FOR PUBLICATION

No. 129,431

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

In the Interest of O.O.,
a Minor Child.

MEMORANDUM OPINION

Appeal from Wyandotte District Court; JANE A. WILSON, judge. Submitted without oral argument. Opinion filed June 5, 2026. Affirmed.

*Patricia Aylward Kalb*, of Kansas City, for appellant natural mother.

*Patrick Grey*, assistant district attorney, and *Mark A. Dupree Sr.*, district attorney, for appellee.

Before MALONE, P.J., BRUNS and HURST, JJ.

PER CURIAM: Mother appeals the termination of her parental rights contending that the district court's decision was based on insufficient evidence and made in error. The record shows Mother suffers from addiction impacting her ability to care for her children, which has resulted in the termination of her parental rights to several other children. Despite evidence showing Mother made significant progress on overcoming her struggles with drug use, the record supports the district court's findings and conclusions. Affirmed.

1

On May 6, 2022, the State petitioned the district court to find O.O. a child in need of care (CINC) under K.S.A. 38-2202(d)(1) and (2). The petition alleged that on February 1, 2022, the Department for Children and Families (DCF) was alerted that Mother overdosed on fentanyl while O.O. was at daycare and O.O. was taken into temporary custody while Mother was unavailable. After Mother received treatment from a hospital, O.O. was returned to Mother and Mother agreed to participate in Family Preservation Services, but she denied voluntarily taking the fentanyl or having substance abuse issues. During her assessment, Mother told her case workers that she planned to obtain a protection from abuse order against O.O.'s father.

The petition further alleged that on April 26, 2022, during a routine visit the Family Preservation Service's case worker reported that Mother exhibited signs of a mental health issue that was negatively impacting her parenting. The worker called a relative who took O.O. for the night. Two days later, Mother was arrested and charged with possession of methamphetamine and drug paraphernalia. The petition included other allegations of drug use, concerning mental health-related behavior, and indications of domestic violence between O.O.'s father and Mother occurring during May 2022.

The petition also documented other cases in which Mother's parental rights were terminated. In total, Mother's parental rights were terminated regarding six prior children between the years 2010 and 2017, with five of the six children having been born with narcotics in their systems. The petition stated that O.O. was born without narcotics in his system and that as soon as Mother learned she was pregnant she entered a three-month rehabilitation program and was not taking illegal substances at the time of O.O.'s birth. After O.O.'s birth, DCF had custody of him for eight months while Mother found a living situation that accepted women and children—she had been living at Oxford House, which did not accept children.

The petition sought custody of O.O. "due to concerns for [Mother's] mental health, concerns for [Mother's] recent possession of methamphetamines, and concerns of [Mother] violating the safety plan." The petition also mentioned Mother's allegations of domestic abuse perpetrated by O.O.'s father. The district court granted DCF temporary custody of O.O. on May 11, 2022.

On June 2, 2022, the district court held a hearing on the matter. Mother entered a stipulation agreeing to some of the allegations in the original petition regarding her mental health and that "there was a need for services to reintegrate with the child." On June 10, 2022, the court entered an order finding O.O. to be a CINC under K.S.A. 38-2202(d)(1)—without adequate parental care, control or subsistence not due solely to the lack of financial means of the child's parents or other custodian— and K.S.A. 38-2202(d)(2)—"without the care or control necessary for the child's physical, mental or emotional health"—based on Mother's stipulation.

As part of the reintegration plan, the district court ordered Mother to complete the following tasks:

- obtain an initial/family assessment and follow the recommendations;

- sign the necessary releases of information;

- obtain and/or maintain stable housing and provide verification;

- obtain and/or maintain stable income and provide verification;

3

- contact the court services officer (CSO) at least once a month and report all address or phone changes;

- participate in age-appropriate parenting education and provide verification;

- complete a mental health assessment and follow all recommendations;

- complete a substance abuse assessment and follow all recommendations;

- submit random, timely, negative urine analyses (UA) at the request of Cornerstones of Care (Agency) and the CSO, and;

- complete a domestic violence assessment and follow all recommendations.

At a review hearing about a year later, the district court ordered Mother to complete a psychological evaluation and follow all recommendations and attend family therapy with O.O.

The State moved to terminate Mother's parental rights on November 21, 2024. The motion alleged Mother "failed to comply with" her case plan tasks "or in the alternative, complied with the plan but failed to adjust her circumstances to meet the needs of the child." The State alleged Mother failed to provide verification of a stable income; failed to maintain routine and sufficient contact with her CSO; failed to maintain stable housing for a period in May 2024; submitted positive UAs; and failed to routinely submit to random UAs. The State alleged Mother was presumed unfit under K.S.A. 38-2271(a)(5)—"the child has been in an out-of-home placement, under court order for a cumulative total period of one year or longer and the parent has substantially neglected or willfully refused to carry out a reasonable plan . . . directed toward reintegration of the child into the parental home"—and that she was unfit under K.S.A. 38-2269(b)(8) for

4

"lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child."

The State filed an amended motion to terminate Mother's rights on February 18, 2025. The amended motion maintained that Mother was unfit under K.S.A. 38-2271(a)(6)—which requires O.O. to have been in DCF custody "for a cumulative total period of two years or longer" and that Mother "failed to carry out a reasonable plan . . . toward reintegration of the child into the parental home; and there is a substantial probability that [she] will not carry out such plan in the near future"—and K.S.A. 38-2271(a)(1)—"the parent has previously been found to be an unfit parent." The amended motion also again alleged Mother was unfit under K.S.A. 38-2269(b)(8)—"lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child."

*The Termination of Parental Rights Court Proceedings*

The district court conducted a termination hearing over two days in April 2025. Mother appeared in person and with counsel. On the first day of the hearing the State asked the district court to take judicial notice of three prior Wyandotte County cases in which Mother's parental rights were terminated as to other children. The court stated it would take judicial notice of those cases. The State also raised the presumption of unfitness under K.S.A. 38-2271(a)(1) based on these earlier cases.

The State first called Mother's CSO to testify. The CSO testified about the case plan tasks Mother was required to complete. With respect to those tasks, the CSO testified that Mother: completed the psychological evaluation; provided verification of her housing; completed two RADAC assessments; completed a mental health intake in May 2024; completed the domestic violence assessment; and completed UAs. When asked whether there were orders that Mother had not completed, the CSO said, "They're a

5

work in progress, I think." She elaborated, saying, "She submitted a positive UA, so that puts her back through needing to complete substance abuse assessments. And she, I believe, has not been released from her mental health situation and counseling. And so I believe that that is ongoing." The CSO testified that Mother's UA on December 5, 2024, was positive for methamphetamine.

She also testified that Mother had "been pretty good about" including the CSO on Mother's communication with the Agency. The CSO testified about Mother's felony possession criminal case in Johnson County, which was pending during DCF's investigation regarding O.O. (Case 2022-CR-1211). The CSO testified that Mother feared O.O.'s father, who was also subject to the termination proceedings, and that Mother had sought protection orders from the district court regarding him. The State then asked the CSO about her thoughts on whether reintegration was appropriate, to which she expressed her concerns:

> "I don't believe it's any longer viable for a couple of different reasons. The amount of time that has gone by. I don't know that either parent is in a totally stable situation to be able to parent him independently and provide him the structure and whatnot that he needs to go forward that he's been provided thus far. And so I don't think it's in his best interest to reintegrate with either of the parents."

Upon questioning by the guardian ad litem (GAL), the CSO testified that Mother's psychological evaluation resulted in a recommendation that she possibly take medication and participate in individual psychotherapy. The CSO testified that Mother had previously worked with Johnson County Mental Health and Wyandotte Mental Health and that she continued to work on her substance and mental health related issues. The GAL asked the CSO about Mother's housing and the CSO said Mother had three address changes, but one of those was to move within the same apartment complex so O.O.'s father would not know her location. On cross-examination, the CSO admitted that another of the address changes was possibly related to Mother being required to live in

Johnson County as part of her probation. She also agreed that Mother had always reported being employed.

The CSO admitted that at a hearing on May 21, 2024, about 11 months before the termination hearing, she had testified that Mother "'made great progress in the court orders for the better part of the last two years.'" The CSO testified that there was some concern in August 2024 that Mother's UAs were diluted but that Mother submitted a hair follicle test months later that was negative. The CSO later testified that she was concerned Mother could not keep O.O. safe because of her substance use and her relationship with O.O.'s father.

The State next called a therapist at Cornerstones of Care. She testified that Mother completed the parent management training and attachment-based therapy (PMTO) program in August 2024. She also testified that during a family therapy session during which O.O.'s father was making everyone feel physically unsafe, O.O. sought comfort from Mother and Mother provided appropriate care and support to O.O. The therapist testified she had no concerns with Mother's ability to identify emotional needs and problems and resolve conflicts.

A case manager with Cornerstones of Care, testified that Mother "had a period of great success in working her case plan goals and court orders" but that in May 2024 she began submitting positive UAs or missing the tests for about six months. The case manager also testified that it was during this period of positive or missed UAs that Mother also did not fully participate in her group sessions through her substance treatment program. The case manager said that Mother's last positive UA occurred in December 2024, and that Mother had not been able to expand visitation which required Mother to comply with the case manager's rules, which meant no missed or positive/diluted UAs and full participation in therapy, for two consecutive months.

The case manager testified that Mother had been able to maintain stable housing despite moving a couple of times. She said Mother had maintained employment "up until recently" and that Mother's last job did not pay her enough. When asked if she had concerns about reintegration, the case manager testified that Mother had shown she can make positive progress and change but that she had not shown she can maintain the progress, and expressed concern with potential relapses in substance abuse. She also identified the domestic violence that permeates Mother's relationship with O.O.'s father.

On cross-examination, counsel asked the case manager about the timing of her recommendation to terminate Mother's parental rights after seeing Mother successfully accomplish much of the case plan:

"Q. So that takes us to August of 2024. And all of a sudden, you are reporting and recommending to the state that they consider termination of parental rights. Correct?
"A. Correct.
"Q. And that is based not on the success that she showed up until May of '24, but because of what happened between May of 2024 and basically July of 2024?
"A. It was based on in part that, and the fact that the case had been open for two years at that point. [O.O.] at that point was only less than 5 years old. So he was a little one. The case had already been going for two months, and while we had seen some positivity from [Mother] and it was going very, very well, this was a repetition of the pattern that we saw when I very first took the case."

The case manager also testified that Mother had taken positive steps to distance herself from O.O.'s father, who the case manager indicated appears to have caused Mother to regress in her case. She also admitted that Mother "has excellent parenting skills when the domestic violence, and the substance abuse, and the trauma is not interfering with her parenting." The case manager agreed Mother had adequate housing and was able to maintain employment. She also admitted that she did not provide any guidance regarding employment.

8

On the second day of the termination hearing, Mother testified that she successfully completed treatment in March 2024 and that she had been submitting negative UAs until about May 2024. The case manager testified that Mother relapsed and sought treatment at the end of May or beginning of June. Mother testified about her treatment for substance use, and that she participated in mental health therapy separately. She admitted she missed some therapy appointments due to work, and some appointments with her CSO due to a lack of reliable transportation. Mother testified about her living situation and how she intends to keep O.O. safe, including by not letting anyone—including O.O.'s father—know her address. She acknowledged that to keep O.O. safe she must be safe as well. Mother said she has "an active PFA against" O.O.'s father.

Mother testified about her progress and growth throughout the case, and she admitted she had a problem with substance abuse. She testified that she was able to recognize the triggers that caused her to relapse, and that she can call her sponsor and attend AA or NA meetings to help stay on track. Mother also testified that she could not have any contact with O.O.'s father, including even to coparent. When Mother's counsel asked Mother how she was different from two years ago or even the year before, Mother responded:

> "I didn't have accountability for the things that I've done. And I've grown a lot since 2022. I've realized that the things that I do doesn't just affect me, it affects [O.O.], you know, so much. And he deserves to have a good mother in his life.
> . . . .
> ". . . I've grown. I've learned a lot more about myself and become more aware of how what I do affects him and the situations around him. Everything I've done is to improve myself for the betterment of me, and so I can be a better parent for [O.O.]."

9

On examination by the State, Mother admitted having positive UAs or missing drug testing on multiple occasions during the 2024 calendar year. Mother also testified that she understood what she needed to do as of May 2024 to expand her visitation time with O.O. but that she could not meet those requirements, and explained the difficulty overcoming drug addiction:

". . . I mean, I tried. It's just like relapse is a hard thing. You know, like, addiction is—is rough. I've maintained compliance with my probation officer. I was just always in violation status due to the violations. So like, but I've seen her every week like clockwork.

"I do not miss—I've missed a couple of my drug and alcohol classes because of my work. But everything that I missed, I always made up. And it's like there was issues between me and my counselor because of the kind of personal situation that happened.

. . . .

"The whole situation with [O.O.'s father] and everything was really stressful on me. And it's like I caved. But I've done a lot of work since then on bettering myself and trying to be a good mother for [O.O.] 'cause he deserves that, and he needs that."

On examination by the GAL, Mother admitted that five out of her six other children—O.O.'s older siblings—were born with narcotics in their systems. However, O.O. and Mother both tested negative for narcotics at O.O.'s birth.

During its closing, the State mentioned the two presumptions of unfitness that it believed Mother met and had not successfully rebutted—one related to a previous finding of unfitness and one related to O.O. being placed out of the home for two years and Mother not carrying out a reasonable plan. See K.S.A. 38-2271(a)(1), (6). The State also argued that the evidence supported a finding that Mother was unfit based on her inconsistent progress in the case, particularly with her positive and missed UAs. The State maintained that the patterns in Mother's relapses indicated her unfitness would not change in the foreseeable future, despite admitting that Mother had been doing well since December 2024.

10

After hearing the remainder of the arguments, the district court took the matter under advisement. The court issued an order terminating parental rights on May 23, 2025. The court found that the concerns that brought O.O. into the State's custody involved drug use, mental health concerns, and domestic violence. The court identified Mother's "history of providing clean drug tests for a period and then providing positive drug tests for a period of time." The order said that Mother was terrified of O.O.'s father but continued to have a relationship with him "during the case," and that Mother "is unable to keep [O.O.] safe from" O.O.'s father. In its order, the court noted that the State requested it take judicial notice of the three earlier Wyandotte County CINC cases: 2011JC544, 2014JC109, and 2017JC211.

The district court's order noted that Mother completed PMTO and that Mother "has cycles of doing well and then regressing to the point that she is not able to parent her child." The court found Mother unfit under K.S.A. 38-2269(b)(8); K.S.A. 38-2271(a)(1); and K.S.A. 38-2271(a)(6). The court also found that Mother's unfitness was unlikely to change in the foreseeable future. Finally, the court found that termination of Mother's rights was in the best interests of O.O. under K.S.A. 38-2269(g)(1).

DISCUSSION

On appeal, Mother challenges each of the district court's findings. Mother contends there was insufficient evidence to support a finding that she was unfit, that the unfitness was unlikely to change in the foreseeable future, and that terminating her parental rights was in O.O.'s best interests. Mother then argues that the district court erred in terminating Mother's rights because the evidence suggested Mother was fit or would be fit in the foreseeable future.

11

## I. THE DISTRICT COURT DID NOT ERR IN FINDING MOTHER UNFIT

Parents have a constitutionally protected liberty interest in a continuing relationship with their children. *Santosky v. Kramer*, 455 U.S. 745, 753, 758-59, 102 S. Ct. 1388, 71 L. Ed. 2d 599 (1982); *In re B.D.-Y.*, 286 Kan. 686, 697, 187 P.3d 594 (2008). A parent's interest in the care, custody, and control of their children has been recognized by the United States Supreme Court as "perhaps the oldest of the fundamental liberty interests." *Troxel v. Granville*, 530 U.S. 57, 65-66, 120 S. Ct. 2054, 147 L. Ed. 2d 49 (2000). This court does not take the question of termination of parental rights lightly.

The Revised Kansas Code for Care of Children governs proceedings to terminate parental rights and allows a court to terminate a parent's rights to their child. K.S.A. 38-2201 et seq. Only upon a finding of "clear and convincing evidence that the parent is unfit by reason of conduct or condition which renders the parent unable to care properly for a child and the conduct or condition is unlikely to change in the foreseeable future" can a court proceed to determine whether termination of parental rights is in the best interests of the child. K.S.A. 38-2269(a). Thus, two initial findings are required: unfitness rendering the parent unable to care properly for the child and that such unfitness is unlikely to change in the foreseeable future.

On review of a district court's decision to terminate parental rights, this court considers the evidence in the most favorable light to the prevailing party—the State in this case—to determine whether the findings of unfitness and the likelihood of future unfitness are supported by clear and convincing evidence. *In re K.W.D.*, 321 Kan. 100, 110, 573 P.3d 221 (2025). Clear and convincing evidence means "the factfinder believes that the truth of the facts asserted is highly probable." *In re B.D.-Y.*, 286 Kan. at 697. In conducting its review, this court does not reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact. *In re Adoption of Baby Girl G.*, 311 Kan. 798, 806, 466 P.3d 1207 (2020).

When determining whether a parent is unfit, the district court must consider a statutory list of nonexclusive factors. K.S.A. 38-2269(b). When the child is not in the parent's custody at the time of the determination, the district court must also consider a separate list of nonexclusive factors. K.S.A. 38-2269(c). While these statutes contain several factors that may support a finding of unfitness, any one of the factors can, but does not necessarily, establish grounds for termination of parental rights. K.S.A. 38-2269(f).

Additionally, a parent is presumed unfit if the State can establish by clear and convincing evidence that the parent meets one of the statutory unfitness presumptions. See K.S.A. 38-2271(a). Once a presumption of unfitness is established, a parent has the burden to rebut the presumption by a preponderance of the evidence. K.S.A. 38-2271(b). Here, the district court found Mother unfit under two statutory presumptions and one factor listed in K.S.A. 38-2269(b).

*K.S.A. 38-2269(b)(8)—Lack of Effort to Adjust Parent's Circumstances*

The district court found Mother unfit based on the "lack of effort on the part of the parent to adjust the parent's circumstances, conduct or conditions to meet the needs of the child." K.S.A. 38-2269(b)(8). The district court's order first acknowledges Mother's history of negative UAs but then says she provided positive tests for a period. It then mentions her inability to meet the Agency's requirement of two consecutive months of treatment and negative UAs to expand visits with O.O. The evidence supports the finding that Mother lacked sufficient effort to adjust her circumstances. Mother had positive, missed, or diluted UAs from about May 2024 through December 2024, and the case manager testified that Mother did not achieve expanded visits by the time of the termination hearing.

13

While not mentioned in the district court's order, there was also evidence Mother failed to maintain consistent communication with her CSO, which was a required case plan task. The district court also addressed Mother's relationship with O.O.'s father as support for this finding. However, there is insufficient evidence in the record regarding this issue. Therefore, the district court's reliance on Mother's alleged failure to adjust her relationship with O.O.'s father to find her unfit is not supported by clear and convincing evidence.

While one problem—here the evidence of relapse and continued drug use from about May 2024 to December 2024—is not always enough to establish that a parent failed to adjust their circumstances or conduct to meet the child's needs, here that one problem is sufficient. Mother has a long history of addiction and drug abuse resulting in unsafe conditions for O.O. At O.O.'s birth, Mother and O.O. were both drug-free, but Mother's history of substance abuse meant that she did not have housing where O.O. could be with her for months after O.O.'s birth. Then Mother had a drug overdose incident that left O.O. without care and resulted in O.O. being in State custody. During the initial period after her overdose, Mother made significant progress—this court has no doubt that Mother loves O.O. and put forth exceptional effort to meet her needs and his needs—but once again Mother relapsed. After that relapse Mother's missed, diluted, and positive UAs, in combination with her lengthy history of substance use, supports a finding of unfitness under this factor. Considering the evidence in the most favorable light to the State, a rational factfinder could have found it highly probable that Mother was unfit under K.S.A. 38-2269(b)(8).

*K.S.A. 38-2271(a)(1)—Presumption of Unfitness from Previous Findings of Unfitness*

The district court found Mother unfit because she had "previously been found to be an unfit parent in [other] proceedings." K.S.A. 38-2271(a)(1). The State presented

14

evidence at the termination hearing of three prior CINC cases involving Mother's other children. Mother testified that five of the six children were born with narcotics in their systems, and on appeal Mother does not dispute that she was found unfit and had her parental rights terminated in those cases. The district court noted in its order that it took judicial notice of the three prior parental termination cases.

On appeal, Mother argues the earlier termination cases are distinguishable with this case because of the temporal and factual differences between the cases. Statutory presumptions of unfitness under K.S.A. 38-2271 are to be "presumed in the manner provided in K.S.A. 60-414." K.S.A. 38-2271(a). Under K.S.A. 60-414, there are two methods on which a court may apply a presumption:

> "(a) if the facts from which the presumption is derived have any probative value as evidence of the existence of the presumed fact, the presumption continues to exist and the burden of establishing the nonexistence of the presumed fact is upon the party against whom the presumption operates; (b) if the facts from which the presumption arises have no probative value as evidence of the presumed fact, the presumption does not exist when evidence is introduced which would support a finding of the nonexistence of the presumed fact, and the fact which would otherwise be presumed shall be determined from the evidence exactly as if no presumption was or had ever been involved."

Under K.S.A. 60-414(a), if the district court finds that the presumption of unfitness in K.S.A. 38-2271(a) applies—which is based on evidence that tends to prove unfitness in and of itself—then the parent can rebut that presumption by showing that a preponderance of the evidence demonstrates they are a fit parent. In contrast, if K.S.A. 60-414(b) applies, meaning the evidence is not itself probative of the presumed facts, any evidence supporting a finding of fitness, including the uncorroborated testimony of a parent, can resolve the presumption of unfitness, and the burden of proving unfitness would once again be upon the State. See *In re J.L.*, 20 Kan. App. 2d 665, 681, 891 P.2d 1125 (1995).

15

The panel from *In re J.L.* identified seven nonexclusive factors the court should use to determine "whether a presumption is a subsection (a) or (b) presumption":

"(1) the passage of time between the earlier order of termination and the current proceeding; (2) whether the same children or siblings of those children were involved in the earlier proceeding; (3) whether the father or fathers of the children involved are the same persons involved in the prior proceeding; (4) whether the facts on which the earlier presumption is based bear any resemblance to the current factual scenario; (5) whether the circumstances surrounding the presumption are such that, in accordance with the experience of mankind, there is a natural and rational evidentiary relation between the facts proven in the earlier action and the facts alleged to be true in the current action; (6) whether the parent has more convenient access to evidence relating to the unfitness to be presented; and (7) whether, by requiring the parent to go forward with the evidence to rebut the presumption, he or she is thereby being subjected to unfairness or hardship." 20 Kan. App. 2d at 681-82.

Here, the district court applied subsection (a), but its order did not address why, and a panel of this court has explained that "[a] conclusory determination that unfit once means unfit always will not be accepted." *In re J.L.*, 20 Kan. App. 2d at 682; see K.S.A. 60-414(a). This court exercises unlimited review of which presumption subsection applies, and in considering the factors identified in *In re J.L.*, the evidence supports the district court's application of subsection (a). See 20 Kan. App. 2d at 681. The following factors support a presumption of unfitness under subsection (a):

(1) Passage of time: The three judicially noticed prior parental termination cases occurred in 2011, 2014, and 2017, the most recent of which concluded in the termination of Mother's rights in November 2017. DCF initiated the present matter in 2022, which reflects a five-year gap between the last termination of Mother's parental rights and this case. While five years is distant, it is not so remote as to diminish its relevance under these circumstances. Moreover, it appears from the

16

record that O.O. was Mother's first child born since the last termination, making the distance in time less relevant.

(2) Same children or siblings: The prior cases involved O.O.'s siblings.

(3) Same fathers: The record reflects that O.O.'s father is the same for at least three of the siblings in the prior cases where Mother was found unfit.

(4) Whether the facts are comparable: While all the cases relate to Mother's addiction to narcotics, they are also different because unlike the other cases O.O. was not born with narcotics in his system and Mother tested negative for narcotics at the time of O.O.'s birth. However, DCF got involved in this case because Mother overdosed while O.O. was at daycare, so all cases involve Mother's addiction to narcotics.

(5) Natural and rational evidentiary relationship between facts from earlier CINC cases and the present cases: There is a running theme in each case related to Mother's substance use issues. However, Mother clearly made significant progress regarding this issue between those cases and this one.

(6) Whether Mother has more convenient access to evidence relating to the unfitness: The access would have been the same.

(7) Whether Mother faces unfairness or hardship in coming forward with evidence to rebut the presumption: Mother does not face hardship or unfairness in coming forward with evidence.

The district court correctly applied the presumption under K.S.A. 60-414(a). As a result of that presumption of unfitness, the burden shifts to Mother to overcome that presumption by proving by a preponderance of the evidence that she was a fit parent. See K.S.A. 38-2271(b) (The burden is on the parent to rebut the presumption of unfitness "by a preponderance of the evidence."). That means, she was required to show "it was more probably true than not" that she was fit. *In re I.W.*, No. 127,198, 2025 WL 573884, at *7 (Kan. App. 2025) (unpublished opinion). If the parent is not able to rebut the presumption by showing that "the parent is presently fit and able to care for the child or that the parent

17

will be fit and able to care for the child in the foreseeable future, the court shall terminate parental rights . . . ." K.S.A. 38-2271(b).

While Mother presented considerable evidence of significant progress in overcoming the substance abuse disorder that plagued her for years, she failed to rebut the presumption of unfitness. Mother's period of success with negative UAs was followed by missed, diluted, and positive UAs for about six months, with her last positive test in December 2024. At the time of the termination hearing in April 2025, Mother did not show she was presently fit or would be fit in the foreseeable future. Mother had a long history of substance abuse with a relapse leading to hospitalization at the beginning of this case on February 1, 2022, and then another relapse that extended from about May 2024 to about December 2024. Unfortunately for Mother, the effects of her addiction are such that her efforts were insufficient to demonstrate present fitness or fitness in the foreseeable future. Considering the evidence in the most favorable light to the State, a rational factfinder could have found it highly probable that Mother was unfit under K.S.A. 38-2271(a)(1).

### K.S.A. 38-2271(a)(6)—Failure to Carry Out a Reasonable Plan

The district court found Mother unfit because O.O. was in the "out-of-home placement, under court order" for two years or longer and Mother "has failed to carry out a reasonable plan, approved by the court, directed toward reintegration" and "there is a substantial probability that the parent will not carry out such plan in the near future." K.S.A. 38-2271(a)(6). There is no dispute that O.O. had been in the State's custody for more than two years at the time of the termination hearing.

However, the evidence at the hearing demonstrated that, aside from her relapse that began in the middle of 2024, Mother had largely complied with the case plan tasks. Mother maintained employment; had stable housing; completed the parenting class;

18

received evaluations and participated in treatment; and participated in visits with O.O. Further, her inconsistent communication with her CSO had reportedly improved, and Mother had not had a positive UA since December 2024. Mother also had a negative hair follicle test in late February or early March 2025. Mother also testified that she had been consistent in seeking treatment and had grown to recognize her triggers and when to call her sponsor or attend a meeting to avoid relapse. Finally, Mother testified that she only missed therapy because she had transportation issues, and no testimony indicated the Agency had attempted to assist Mother with transportation.

Other than the drug relapse and addiction issues, which were addressed by the district court in other findings, Mother had largely complied with the case plan tasks or could in the foreseeable future. As a result, there was insufficient evidence to support the district court's finding of this presumption. However, because unfitness can be based on one factor—and there was sufficient evidence supporting the district court's finding of unfitness under K.S.A. 38-2269(b)(8) and K.S.A. 38-2271(a)(1)—the court did not err in finding Mother presently unfit.

II. THE DISTRICT COURT DID NOT ERR IN FINDING MOTHER UNFIT FOR THE FORESEEABLE FUTURE.

After a district court finds a parent "unfit by reason of conduct or condition which renders the parent unable to care properly for a child," as the court did here, then the court determines whether the "conduct or condition is unlikely to change in the foreseeable future." K.S.A. 38-2269(a). Even when considering the presumption of unfitness under K.S.A. 38-2271(a)(1), the district court "shall terminate parental rights in proceedings pursuant to K.S.A. 38-2266 et seq., and amendments thereto." K.S.A. 38-2271(b).

As with an unfitness finding, a district court's foreseeability finding must be supported by clear and convincing evidence. *In re K.W.D.*, 321 Kan. at 110. This court does not reweigh conflicting evidence, pass on the credibility of witnesses, or redetermine questions of fact when evaluating the district court's foreseeability determination. *In re Adoption of Baby Girl G.*, 311 Kan. at 806. In deciding whether a parent will remain unfit for the foreseeable future, a district court may consider patterns of behavior, attributing past conduct to future behavior, and can "give weight to actions over intentions." *In re D.G.*, 319 Kan. 446, 459, 555 P.3d 719 (2024). This court analyzes this issue from the child's perspective of time because children deserve "'permanency within a time frame reasonable to them.' *In re M.H.*, 50 Kan. App. 2d 1162, 1170, 337 P.3d 711 (2014)." *In re D.G.*, 319 Kan. at 459. Facts that support a finding that a parent will remain unfit for the foreseeable future include "when the time for completion has been extended, the parent makes little progress towards reintegration during that added time, and reintegration is still not possible or expected in the near future." 319 Kan. at 459.

While the district court did not explicitly link facts to its foreseeability determination, its order focused on Mother's period of positive UAs, connected with Mother's inability to secure expanded visits by the time of the termination hearing.

Regarding her UAs and the foreseeability of Mother's ability to care for O.O., Mother tested negatively until May 2024 and then had missed, diluted, or positive tests for about six months. Mother admitted she relapsed. The State moved for termination near the end of November 2024. The last confirmed positive test was in early December 2024 for methamphetamine, although Mother had a negative hair follicle test in February or early March 2025.

The Agency case manager admitted that she recommended termination when Mother first relapsed, and that she did not consider Mother's progress prior to that time.

20

The case manager's recommendation was based in part on Mother's relapse but also because O.O. was young and had been in custody for two years—despite describing Mother's previous progress as going "very, very well." The case worker also admitted that Mother "has excellent parenting skills when the domestic violence, . . . the substance abuse, and the trauma is not interfering with her parenting."

Mother also testified that she had been consistent in seeking treatment and had grown to recognize her triggers, and that she knew when to call her sponsor or attend a meeting to avoid relapse. While Mother denied using substances at the initiation of the case, at the termination hearing she admitted that she struggles with addiction. The evidence at the hearing indicates that, aside from her relapse that began in the middle of 2024, Mother had complied with the case plan tasks—although the CSO testified that Mother did not always maintain consistent communication but that it had recently gotten better.

Finally, regarding Mother's inability to secure expanded visits—which required two consecutive months of negative UAs and full compliance with her treatment program—at the time of the hearing in April 2025, Mother had not had a positive test since December 2024. She had been requested to take tests prior to the negative hair follicle test in February or March 2025 and had failed to do so. Mother testified that she only missed therapy because she had transportation issues or work and she insisted she always made up her appointments, so none were skipped. No testimony indicated the Agency had attempted to assist Mother with her transportation issues to therapy appointments. There was also no testimony from any of Mother's therapists, aside from the therapist who performed family therapy in connection with the Agency.

While the evidence is not abundant, given the circumstances it is sufficient to uphold the district court's foreseeability determination. Mother is presumed unfit, in part, because of her prior termination proceedings which all related to Mother's substance

abuse disorder and addiction. Mother's current case originated from her substance abuse which caused her hospitalization and left O.O. without care. Then, during these case proceedings Mother relapsed for multiple months.

When these facts are considered in the child's time, they are more significant. After O.O.'s birth, he was unable to live with Mother because she lived in a recovery facility that did not permit children. After reuniting, Mother relapsed to the point of hospitalization. O.O. was just two years old when he was taken from Mother's custody due to her substance abuse, and during the time of the case, Mother failed to maintain sobriety and comply with other case orders to achieve reunification or extended visitation for more than two years. Considering O.O.'s young age, Mother's inability to maintain sobriety—given her significant history of substance abuse that negatively impacted her ability to care for her children—demonstrates by clear and convincing evidence that Mother will be unfit for the foreseeable future.

Overcoming substance abuse disorder and addiction is exceedingly difficult, and Mother made significant progress. Unlike several of O.O.'s siblings, O.O. was not born with narcotics in his system. However, within about two and a half years of O.O.'s birth, Mother suffered from a narcotic overdose necessitating hospitalization and leaving O.O. without care in about February 2022. Mother's substance abuse and addiction significantly impacted her ability to care for O.O. by inhibiting her housing, employment, stability, and ability to maintain safe relationships. Mother testified that O.O.'s father contributed to her drug abuse, and Mother had difficulty distancing herself from the father throughout the proceedings. Then Mother failed to maintain sobriety for several months during the case proceedings. Although Mother demonstrated success after her period of relapse until the termination hearing, the pattern before the hearing is consistent and undeniable. Mother relapsed using methamphetamine in May 2024 until at least December 2024. While Mother requested a hair follicle drug test as the hearing neared, she failed to complete it for multiple months indicating a continued struggle with

addiction. The district court explained the pattern, saying "the mother has cycles of doing well and then regressing to the point that she is not able to parent her child." At the time of the hearing in April 2025, it had been less than six months since Mother's last UA that was positive for methamphetamine use.

Reviewing this evidence, Mother failed to rebut the presumption of unfitness established under K.S.A. 38-2271(a) by showing by a preponderance of the evidence that she will be fit to care for O.O. in the foreseeable future. See K.S.A. 38-2271(b). Additionally, there is clear and convincing evidence that supports the district court's finding that Mother would be unfit to care for O.O. for the foreseeable future. See K.S.A. 38-2269(a).

This case is distinguishable from other cases where the parent has made significant strides to comply with reintegration case plans because Mother has a serious and prolonged history of substance abuse that impacts her ability to care for her children. See, e.g., *In re K.R.*, 43 Kan. App. 2d 891, 904-05, 233 P.3d 746 (2010); see also *In re A.G.*, No. 126,668, 2024 WL 874949, at *8 (Kan. App.) (unpublished opinion) (affirming the district court's foreseeability finding "mainly because Mother tested positive for THC twice in the months just before the termination hearing"), *rev. denied* 319 Kan. 833 (2024). Considering the evidence in the most favorable light to the State, a rational factfinder could have found it highly probable that Mother's unfitness was unlikely to change in the foreseeable future.

III.    THE BEST INTERESTS OF THE CHILD

The final step in the proceedings is a determination of whether termination of parental rights is in the child's best interests. In making this determination, "the [district] court shall give primary consideration to the physical, mental and emotional health of the child." K.S.A. 38-2269(g). Relevant factors include the features of the child's relationship

23

with the parent and the potential harm from losing that relationship, the prospective guardian's ability to care for the child, the potential adoptive placement options, and how achieving permanency for the child will impact the child. See *In re D.G.*, 319 Kan. at 462.

An appellate court reviews a district court's decision that termination of parental rights was in the child's best interests for an abuse of discretion. *In re R.S.*, 50 Kan. App. 2d 1105, 1114-15, 336 P.3d 903 (2014). A district court abuses its discretion if its decision is arbitrary, fanciful, or unreasonable or is based on an error of law or fact. *In re T.H.*, 60 Kan. App. 2d 536, 555-56, 494 P.3d 851 (2021). Here, Mother bears the burden of showing the district court abused its discretion. *In re P.J.*, 56 Kan. App. 2d 461, 466, 430 P.3d 988 (2018).

Here, the district court's order refers to the case manager's belief that reintegration was not in O.O.'s best interests. After delineating its unfitness findings, the court concludes in its order that "considering the physical, mental and emotional well-being of this child," termination of Mother's rights was in O.O.'s best interests.

Mother argues the evidence showed that she completed her parenting class, she acted appropriately in comforting O.O. and could identify O.O.'s needs, O.O. loved Mother and felt safe with her, and the two shared a strong bond. This all appears to be true based on a review of the testimony and record. The case manager testified that Mother has "excellent parenting skills" when her other barriers and issues are removed from the equation.

However, it is Mother's burden to demonstrate the district court abused its discretion. Mother asserts no error of law or fact, therefore Mother must show that no reasonable person would have agreed with the district court that it was in O.O.'s best interests to terminate Mother's parental rights. *In re A.S.*, 319 Kan. 396, 400, 555 P.3d

24

732 (2024). Given O.O.'s age (under three years old) at the time he was removed from Mother's custody and the duration of the case, almost three years, this court cannot say the decision was unreasonable. At the time of the termination hearing, O.O. had spent more of his life outside of Mother's custody than with Mother, and there was no reasonably foreseeable end in sight. Mother had tested positive for methamphetamine after years of significant addiction impacting her ability to care for O.O. and his siblings, less than six months before the hearing.

O.O. had been in custody for almost three years and the record suggests he is in a kinship placement with Mother's stepcousin. This suggests that O.O. has a stable placement. While the record reflects that Mother has a loving relationship and bond with O.O., children also need permanency and stability which Mother is unable to offer. This court cannot say that no reasonable person would agree with the district court's determination that termination of Mother's parental rights was in O.O.'s best interests due to Mother's addiction and resulting pattern of instability. Thus, the district court did not err in terminating Mother's rights.

## CONCLUSION

The district court's findings regarding Mother's unfitness and the likelihood of her unfitness changing were based on clear and convincing evidence. Mother has failed to show the court erred in terminating her parental rights despite making obvious progress in overcoming her drug addiction.

Affirmed.